2006 ME 34

**Joseph R. DIONNE et al.**

v.

**Jean LeCLERC et al.**

v.

**Philip Roy.**

Supreme Judicial Court of Maine.

Argued: Oct. 18, 2005.

Decided: April 4, 2006.

Richard D. Solman, Esq. (orally), Solman & Hunter, P.A., Caribou, for plaintiffs.

William J. Smith, Esq. (orally), Smith Law Office, LLC, Van Buren, (for Jean LeClerc), Richard L. Currier, Esq. (orally), Currier & Trask, P.A., Presque Isle, (for Philip Roy), for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

DANA, J.

[¶ 1] Jean and Celine LeClerc appeal from a judgment entered in the Superior Court (Aroostook County, *Mills, C.J., and Jabar, J.*) that: (1) adopted a referee's report declaring that Joseph and Nelson Dionne have record title to a disputed parcel of land in Fort Kent; (2) awarded the Dionnes timber trespass damages against Jean LeClerc for cutting trees on the disputed parcel; and (3) awarded no damages on the LeClercs' third-party claim against Philip Roy for breach of the covenant of warranty. Because we find no error in the referee's determination of title, we affirm the portion of the judgment adopting the referee's report. Because we agree with the LeClercs that the court erred in granting judgment as a matter of law on the amount of timber trespass damages and applied the wrong measure of damages for breach of the covenant of warranty, we vacate the judgment on the timber trespass and third-party claims.

## I. BACKGROUND

[¶ 2] The land at issue is part of Lot C, which is one of the original river lots extending south of the St. John River, in what is now the Town of Fort Kent, that were laid out in the mid-nineteenth centu-

ry after the river was established as the border with Canada by the Webster–Ashburton Treaty of 1842. The parties' dispute concerns the southeast portion of Lot C, a strip fifty rods wide from the eastern line of the lot, extending from an east-west ridge line on the north to the southern line of the lot. The commissioners appointed by the State to settle land claims in the vicinity of the border awarded Lot C to Antoine Ouellette (sometimes spelled "Ouillette"), and the State land agent conveyed Lot C to Ouellette's transferees by three deeds executed in 1871. Joseph and Nelson Dionne claim title to the disputed portion of Lot C under a chain of title extending from the 1871 State deed to Benjamin Ecureuil, recorded in 1907, to a 1984 deed to the Dionnes from their father, Omer Dionne. Jean and Celine LeClerc claim title under a chain of title extending from an 1881 quitclaim deed from Francis Penet to Dick Lefarier, recorded in 1887, to two 1995 deeds to the LeClercs from third-party defendant Philip Roy. Roy sold his interest in the southern part of Lot C (including the southwest portion, not claimed by the Dionnes) to the LeCleros for $2400, giving them a quitclaim deed to the easternmost twenty rods and a warranty deed to the remainder.

[¶ 3] In June and July 1999, a contractor hired by Jean LeClerc cut trees on the disputed property. The contractor paid LeClerc $7787 for the timber. At the request of the Dionnes, employees of the Maine Forest Service tallied the stumps and calculated the statutory forfeiture amount pursuant to 17 M.R.S. § 2510(2) (2005).[1] The Dionnes filed a complaint

---

1. Title 17 M.R.S. § 2510(2) (2005) provides:

   **2. Forfeitures.** The following forfeitures may be adjudged for each tree over 2 inches in diameter that has been cut or felled:

   **A.** If the tree is no more than 6 inches in diameter, a forfeiture of $25;
   **B.** If the tree is over 6 inches and up to 10 inches in diameter, a forfeiture of $50;
   **C.** If the tree is over 10 inches and up to 14 inches in diameter, a forfeiture of $75;

against the LeClercs in August 2001, seeking statutory timber trespass damages pursuant to 14 M.R.S. §§ 7552[2] and 7552-A (2005) and a declaratory judgment that they had title to the disputed parcel by record or by adverse possession. The LeClercs filed a third-party complaint against Roy for breach of the covenant of warranty.

[¶ 4] By agreement of the parties, the issue of record title was tried before a referee. The referee concluded that the Dionnes had record title to the disputed parcel. The court (*Mills, C.J.*) adopted the referee's report over the LeClercs' objection. The Dionnes abandoned their claims for adverse possession and for damages under 14 M.R.S. § 7552-A, and in November 2004, the case went to trial before a jury on the section 7552 claim and the third-party complaint.

[¶ 5] At trial, Maine Forest Ranger Lance Martin testified, over the LeClercs' objection, that he took part in the tally of the stumps on the disputed parcel and that

 D. If the tree is over 14 inches and up to 18 inches in diameter, a forfeiture of $100;

 E. If the tree is over 18 inches and up to 22 inches in diameter, a forfeiture of $125; and

 F. If the tree is greater than 22 inches in diameter, a forfeiture of $150.

2. Title 14 M.R.S. § 7552 (2005) provides in relevant part:

 **§ 7552. Injury to land, forest products or agricultural products**

 **1. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

 . . . .

 C. "Forest products" means logs, pulpwood, veneer, bolt wood, wood chips, stud wood, poles, pilings, biomass, fuel wood, Christmas trees, maple syrup, nursery products used for ornamental purposes, wreaths, evergreen boughs or cones or other seed products.

 . . . .

 E. "Professional services" may include:
 (1) The damage estimate of a licensed professional forester;
 (2) A boundary survey;
 (3) A title opinion; and
 (4) Attorney's fees for preparing the claim and bringing a court action.

 **2. Prohibitions.** Without permission of the owner a person may not:

 A. Cut down, destroy, damage or carry away any forest product . . . or property of any kind from land not that person's own . . . .

 **3. Measure of damages.** This subsection governs' the measurement of damages resulting from a violation of subsection 2.

 . . . .

 B. For lost trees, the owner may claim in lieu of market value the forfeiture amounts determined in Title 17, section 2510, subsections 2 and 3 . . . . The court may reduce the damages awarded for good cause shown when the cutting of trees was done negligently or without fault.

 . . . .

 **4. Damages recoverable.** Damages are recoverable as follows.

 A. A person who negligently or without fault violates subsection 2 is liable to the owner for 2 times the owner's damages as measured under subsection 3 or $250, whichever is greater.

 B. A person who intentionally or knowingly violates subsection 2 is liable to the owner for 3 times the owner's damages as measured under subsection 3 or $500, whichever is greater.

 . . . .

 **5. Costs and fees.** In addition to damages, interest and costs, the owner may also recover from the person who violates subsection 2 the reasonable costs of professional services necessary for determining damages and proving the claim, provided that the person first has written notice or actual knowledge that a claim is being asserted. The amount awarded for professional services may not exceed 50% of the damages recovered pursuant to subsection 4 plus interest on the damages. Interest may be assessed after service of a notice of claim pursuant to section 1602.

the forfeiture amount arrived at was $54,475. On the Dionnes' timber trespass claim, the trial court (*Jabar, J.*) granted Celine LeClerc's motion for judgment as a matter of law in her favor because it was undisputed that she was not responsible for cutting the trees, and denied Jean LeClerc's motion for judgment as a matter of law. The court granted the Dionnes' motion for judgment as a matter of law against Jean LeClerc on the timber trespass claim, on the basis that it was uncontested that he was responsible for the woodcutting and that Martin's testimony on damages was unrefuted. On the LeClercs' third-party claim against Roy, liability was uncontested because the court's adoption of the referee's report finding superior record title in the Dionnes operated as a constructive eviction of the LeClercs and thus as a breach of Roy's covenant of warranty. The court denied Jean LeClerc's request for a jury instruction that his damages against Roy for breach of the covenant of warranty would include the amount of costs and damages LeClerc would be required to pay the Dionnes for the timber trespass.

[¶ 6] The court submitted two issues to the jury: (1) whether Jean LeClerc's timber cutting was intentional or knowing (which would determine whether the Dionnes would be entitled to double or treble damages, 14 M.R.S. § 7552(4)(A), (B)); and (2) the present value of the land Roy purported to convey to the LeClercs by warranty deed (which the court held to be the proper measure of damages for breach of the covenant of warranty). The jury found that the cutting was not intentional or knowing and that the present value of the land was zero. The court declined to reduce the timber trespass damages for good cause pursuant to 14 M.R.S. § 7552(3)(B) because it determined that the good cause provision, which took effect after the trees were cut on the disputed land, did not apply retroactively. The court thus entered judgment for the Dionnes against Jean LeClerc for double damages of $108,950 plus attorney fees of $28,805 and other professional fees of $1650. On an issue the parties had reserved to the court, it declined to award the LeClercs their attorney fees and expenses incurred in defending their title against the Dionnes as damages for Roy's breach of the covenant of warranty. The LeClercs thus recovered nothing on their third-party complaint. They then brought this appeal.

## II. RECORD TITLE

[¶ 7] The referee concluded that the Dionnes had superior record title because their chain of title could be traced to an 1871 State deed and the LeClercs' chain of title could only be traced to an 1881 quitclaim deed from a grantor who lacked record title. On appeal, the LeClercs raise several challenges to the referee's determinations. Those determinations were based on the interpretation of deeds, which is an issue of law that we review de novo. *Wentworth v. Sebra*, 2003 ME 97, ¶ 10, 829 A.2d 520, 524. The issues relating to title are quite complicated and we need not discuss them exhaustively. Instead, we explain in summary fashion why we agree with the referee that the Dionnes had superior record title.

[¶ 8] There is no dispute that the LeClercs had an unbroken chain of title dating to 1881. The issues on appeal primarily concern the Dionne chain of title, which the referee aptly termed "quite problematic" but ultimately found could be traced to the 1871 State deed. We agree with the referee's interpretation of the three State deeds to Lot C, under which record title to the southeast portion of the lot, approximately the parcel disputed in this case,

was conveyed to Benjamin Ecureuil, a/k/a Benjamin Squirrel, a/k/a Benjamin St. Germain Sr. Because the Ecureuil deed is ambiguous, the referee properly looked to the other two deeds executed by the State land agent at the same time, and construed them together. *See Knight v. Dyer*, 57 Me. 174, 176 (1869).

[¶ 9] The Dionne title chain thus began in 1871. The referee concluded that title remained in the St. Germain family until 1930, despite several intra-family transfers and an invalid 1918 deed to Bruno Dionne, the Dionnes' grandfather. Between 1930 and 1940 there were at least eleven deeds to the disputed property, several of them by transferors who did not have title at the time of the conveyance. (The picture is further complicated because some of those deeds, and a number of others involving the same parties, conveyed or purported to convey title to land to the east of the disputed property, apparently comprising some or all of Lot D.) There were deeds to Emile Ouellette in 1937, 1938, and 1940; the referee found the 1938 deed from Thomas Soucy, who had acquired title from Sophie (St. Germain) (Cote) Doustou in 1930, was effective to give Ouellette record title. Ouellette never conveyed back into the Dionne chain of title, so his ownership was effective to break that chain.

[¶ 10] The Dionnes contend that the break in their chain of title was cured in two different ways. First, they argue that when Ouellette took title in 1938, his title immediately inured to Bruno Dionne under the doctrine of estoppel by after-acquired title, *see generally, e.g., Taylor v. Richardson*, 432 A.2d 1307, 1310 (Me.1981), because Ouellette had previously conveyed to Fred Dionne, and Fred had conveyed to Bruno, at a time when none of them had title. The referee accepted this argument. The LeClercs note that the referee's analysis appears to ignore an important deed, a purchase-money mortgage given to Ouellette by Fred Dionne; they contend that that deed makes the after-acquired title doctrine inapplicable here.

[¶ 11] We need not decide this issue, because even if the LeClercs are correct, we agree with the Dionnes that subsequent events cured the break in their title chain. Bruno Dionne conveyed his interest in the property to Omer Dionne, the plaintiffs' father, in 1940. Whatever interest Omer had, however, was subsequently lost to the Town of Fort Kent due to unpaid taxes. Emile Ouellette's interest was also lost to the Town by undischarged tax liens in 1942 and 1943. In 1957, the Town gave Omer Dionne a quitclaim deed to the property. We agree with the referee's conclusion that, because the deed's granting clause conveyed all the Town's right, title, and interest, the subsequent statement that the purpose of the deed was to convey the interest acquired by tax liens for certain years could not defeat the absolute language of the grant. *See Whitney v. Town of Woodville*, 575 A.2d 313, 315 (Me.1990); *Smith v. Sweat*, 90 Me. 528, 533, 38 A. 554, 556 (1897). Contrary to the LeClercs' contention, the description in the quitclaim deed included the disputed portion of Lot C. Accordingly, that 1957 deed was effective to give title to Omer Dionne, who completed the plaintiffs' title chain by conveying to them in 1984.

[¶ 12] With the break in the chain of title thus cured, the Dionnes were able to trace their title to the 1871 State deed. The LeClercs' title chain originated later and with a deed from a grantor who lacked record title. Nor can the LeClercs gain priority because the first deed in the LeClerc chain was recorded earlier than any deed in the Dionne chain. The LeClercs' reliance upon the 1887 recording of the

1881 quitclaim deed from Francis Penet to Dick Lefarier of "all my right, title, and interest" in, inter alia, the southern portion of Lot C, is unavailing. Deeds conveying only the grantor's right, title, and interest did not receive the protection of the recording act until 1904. *Hooper v. Leavitt,* 109 Me. 70, 73–74, 82 A. 547, 549 (1912); *see* P.L.1903, ch. 220 (now codified at 33 M.R.S. § 201 (2005)). The referee was correct, therefore, to conclude that the Dionnes had superior record title.

### III. TIMBER TRESPASS

A. Testimony of Forest Ranger Lance Martin

[¶ 13] Jean LeClerc alleges several errors in the trial on the Dionnes' timber trespass claim. He first contends that the court erred in denying his motion for judgment as a matter of law. The basis of that motion, however, was that without the testimony of Forest Ranger Lance Martin, the Dionnes had not proved their damages; the real issue was thus the admissibility of Martin's testimony. Contrary to LeClerc's contention, Martin did not offer an expert opinion, but testified based on his personal knowledge of the results of the stump count he and other Maine Forest Service employees conducted on the Dionnes' land. *See* M.R. Evid. 602, 701; *State v. Parks,* 544 A.2d 1269, 1271 (Me. 1988). The court neither abused its discretion in allowing Martin's testimony nor erred in denying LeClerc's motion for judgment as a matter of law.

B. Judgment as a Matter of Law on Damages

[¶ 14] Jean LeClerc next contends that the court erred in granting judgment as a matter of law in favor of the Dionnes on the amount of their timber trespass damages. LeClerc argues that the issue should have gone to the jury even though Martin's testimony was uncontradicted. We agree.

[¶ 15] The assessment of damages is within the sole province of the fact-finder, *Avery v. Kennebec Millwork, Inc.,* 2004 ME 147, ¶ 3, 861 A.2d 634, 635, as are determinations of the credibility and weight of evidence, *Estate of Siebert,* 1999 ME 156, ¶ 10, 739 A.2d 365, 368. More particularly, a fact-finder, whether it be a jury or a court, is "not required to believe witnesses, even if the testimony of [those] witnesses, be they experts or lay witnesses, is not disputed." *Irish v. Gimbel,* 2000 ME 2, ¶ 8, 743 A.2d 736, 738. When the party who bears the burden of proof introduces evidence that is undisputed, we have held that the "fact-finder ha[s] the prerogative selectively to accept or reject it, in terms of the credibility of the witnesses or the internal cogency of the content." *In re Fleming,* 431 A.2d 616, 618 (Me.1981); *accord In re Andrea W.,* 537 A.2d 596, 598 (Me.1988) ("We have long recognized the principle that the [fact-finder] has the responsibility to assess the credibility of the witnesses and to find facts, and may reject the entire testimony of an uncontradicted witness.").

[¶ 16] Had the jury been allowed to decide the issue of damages, it could have accepted Martin's uncontradicted testimony and found statutory forfeiture damages in the amount of $54,475. Our precedents make it clear, however, that it would also have been the jury's prerogative to find Martin not to be credible and reject his testimony. By granting the Dionnes' motion for judgment as a matter of law, the court effectively decided the credibility question itself and determined that the jury would have had no choice but to accept Martin's testimony. This was error.

C. Reduction of Damages for Good

Cause[3]

**■** [¶ 17] It was undisputed that Jean LeClerc was responsible for the cutting and removal of trees from the disputed property. Because the jury found that LeClerc had not acted intentionally or knowingly, he must have acted negligently or without fault, which normally would entitle the Dionnes to double damages under 14 M.R.S. § 7552(4)(A). LeClerc asked the court to reduce the damages pursuant to the last sentence of section 7552(3)(B), which provides, "The court may reduce the damages awarded for good cause shown when the cutting of trees was done negligently or without fault." This provision became effective September 18, 1999, P.L. 1999, ch. 339, after the trees were cut in this case, and the court declined to apply it retroactively.

[¶ 18] LeClerc argues that the good cause provision is procedural, not substantive, in nature, and therefore may be applied retroactively. The trial court rejected this argument, and we agree with the court. In *Howe v. Natale*, 451 A.2d 1198, 1201 (Me.1982), the plaintiffs sought to increase their recovery by retroactive application of an amendment to section 7552 that increased the plural damages available from double to treble. We held that the amendment should not have been applied retroactively because "[t]he law of damages is a matter of substance which is fixed when the cause of action accrues." *Id.; see also Raymond v. Lyden*, 1999 ME 59, ¶ 1 n. 2, 728 A.2d 124, 125 (stating that trespass provision of 14 M.R.S.A. § 7551–B (Supp.1998) should not have been applied retroactively). In this case, LeClerc seeks to reduce his liability by retroactive application of an amendment to section 7552 that may decrease the damages avail-

able. We see no principled distinction between the two cases. The 1999 amendment is as substantive as the one at issue in *Howe*, and the court did not err in failing to apply it retroactively.

## IV. BREACH OF THE COVENANT OF WARRANTY

### A. Measure of Damages

[¶ 19] Jean LeClerc contends that the court erred in refusing to instruct the jury that his damages for Roy's breach of the covenant of warranty included the amount he would be required to pay the Dionnes as damages on their timber trespass claim. The LeClercs also contend that the court erred in refusing to award them the attorney fees and expenses they incurred in defending the Dionnes' action as damages for Roy's breach. They do not challenge the court's determination that their damages included the present value of the land or the jury's finding that the present value was zero.

**■** [¶ 20] We have not discussed the measure of damages for breach of the covenant of warranty for over a hundred years. The general rule found in our nineteenth-century cases is that "the measure of damages for breach of the covenant of warranty is, in this State, the value of the premises at the time of the eviction with interest, and the expenses reasonably and actually incurred in the defence of the former suit." *Hardy v. Nelson*, 27 Me. 525, 530 (1847); *accord, e.g., Williamson v. Williamson*, 71 Me. 442, 447 (1880); *Swett v. Patrick*, 12 Me. 9, 9–10 (1835). Applying that rule in this case requires us to recognize that, due to the joinder and third-party practice rules of modern civil procedure, *see* M.R. Civ. P. 14, 18, there

---

**3.** This issue is appropriately before us, notwithstanding our decision to vacate the damage award, because it will arise again on

remand if the jury awards any damages to the Dionnes.

was no former suit or previous eviction. Beyond that we see no reason that the law should have changed. The value of the land at the time of eviction here would be the value at the time that the LeClercs were constructively evicted by the judgment declaring the Dionnes to have superior title, which the court reasonably approximated as the present value at the time of trial. That element of the damages is not at issue on appeal.

[¶ 21] The issue raised by the LeClercs' argument is the degree to which the amounts paid in an unsuccessful defense related to the title may be recovered as damages for breach of the covenant of warranty. We held in *Swett v. Patrick*, 12 Me. at 10, that the recoverable expenses include attorney and witness fees and the costs paid to the superior titleholder in the prior action. We affirmed this rule in *Ryerson v. Chapman*, 66 Me. 557, 562 (1877), stating that "in this state, the costs of the former action and the expenses of counsel fees attending it, whether in asserting or defending the title, are a portion of the damages recoverable."

[¶ 22] In *Ryerson* we also held that the recoverable costs and expenses can include damages paid to the holder of the paramount title, and are not limited to those arising from a single action. *Id.* at 561–62. This was demanded by the nature of the covenant:

> The covenant of warranty amounts to an agreement of indemnity. The foundation of a claim for damages under it, must be that an eviction, or something equivalent thereto, has properly taken place. The covenantee, who has been evicted, is entitled to have repaid to him all reasonable outlay which he in good faith expends for the assertion or defense of the title warranted to him.

*Id.* at 561. It follows that the covenantee "may recover for the damages and costs and expenses of suits brought against him, and also for the costs and expenses of suits brought by him, affecting the title to the estate. Each suit may have been part of the means by which the title was sought to be defended." *Id.* at 561–62.

[¶ 23] We did not explain in detail the elements of Ryerson's damages for breach of the covenant. They apparently included the one dollar in nominal damages that Ryerson had paid to the holder of the paramount title in a prior trespass action, *see Carleton v. Ryerson*, 59 Me. 438, 440 (1871), but there was no indication in our opinion whether any of the eight other suits that Ryerson lost required him to pay any substantial damages. We reduced Ryerson's damages to $400, from the more than $600 that he claimed, because although multiple suits may have been justified, it appeared that litigating nine separate actions relating to title was unreasonable. 66 Me. at 563–64.

**B. Expenses for Defending Declaratory Judgment Claim**

[¶ 24] Applying the holding of *Ryerson* to this case, we must conclude that the trial court erred in awarding the LeClercs no damages against Roy. The referee's determination that the Dionnes had superior title, which we have affirmed, means that Roy breached his covenant of warranty. As damages for that breach, the LeClercs are entitled to their reasonable expenses, including attorney fees, incurred in unsuccessfully defending their title to the premises covered by the warranty against the Dionnes' declaratory judgment claim. They are not, of course, entitled to any of their expenses for their unsuccessful defense of their title to the land Roy conveyed to them by quitclaim.

**C. Expenses for Defending Timber Trespass Claim**

[¶ 25] The expenses incurred by the LeClercs in defending the Dionnes'

timber trespass claim are a different question. Title was not directly at issue when that claim went to trial, because it had already been decided by the referee. We cannot say, however, that the timber trespass claim was not a "suit[ ] . . . affecting the title to the estate." *Ryerson*, 66 Me. at 562. Jean LeClerc's only real defense to liability on that claim was that he and his wife, and not the Dionnes, held superior title. With that defense foreclosed at trial, he did not contest liability, but his primary defense on damages—which succeeded in convincing the jury that he had not acted intentionally or knowingly—was that when the trees were cut he believed that he had title. The title issue was thus intertwined with the timber trespass claim even though it was not decided by it. Under *Ryerson*, because of the breadth of the indemnity offered by the covenant of warranty, it is not necessary that the claim be determinative of title, only that the defense or assertion of the claim have a good-faith relation to the defense or assertion of the title. *See id.* at 561. As damages for Roy's breach of the covenant, therefore, the LeClercs are entitled to their reasonable expenses, including attorney fees, for their defense of the Dionnes' timber trespass claim, to the extent that that claim is for trespass to the premises covered by the warranty. Again, they are not entitled to any reimbursement insofar as the claim relates to the property conveyed by Roy's quitclaim deed.

### D. Timber Trespass Damages

■ [¶ 26] That does not determine whether Jean LeClerc is entitled to have Roy indemnify him for the amount of the timber trespass judgment the Dionnes may obtain against him, including statutory double damages, attorney fees, and other professional fees. Under the principles of *Ryerson*, it would seem that trespass damages would be recoverable if the tres-

pass merely consisted of entering or remaining on the land in order to assert or defend title. We have never held, however, that trespass damages may be recovered for the breach of the covenant of warranty when the trespass ultimately caused substantial injury to the land in reliance on the warranty of title; nor have we found any cases from other jurisdictions so holding.

■ [¶ 27] There are limits to the reliance on a covenant of warranty that can be considered justifiable. Of course a covenantee is normally justified in defending against a claim of superior title, which explains why litigation expenses are recoverable as damages for breach of the covenant. Before litigation, a covenantee's good-faith reliance on a warranty of title in erecting improvements on the land is protected by the basic measure of damages, which is the value of the land, including improvements, at the time of eviction. *See Elder v. True*, 32 Me. 104, 109 (1850); *see also Cecconi v. Rodden*, 147 Mass. 164, 16 N.E. 749, 751–52 (1888). That rule may result in significant liability for the covenantor, but it is well-rooted in the nature of the covenant as it has always been understood in Maine as well as in Massachusetts, Vermont, and Connecticut. *See* Annotation, *Measure of damages for breach of covenants of title in conveyances or mortgages of real property*, 61 A.L.R. 10, 30–32, 188 (1929). Our rule is ordinarily more generous than the measure of damages in the majority of states, where only the consideration paid can be recovered, *id.* at 24, but it is well-rooted in our history. Our law has not, however, historically protected a covenantee's interest in committing a trespass that causes injury to the land in reliance on the warranty of title. A rule allowing the substantial damages paid for such a trespass to be recovered in an action for breach of the cove-

nant of warranty would be, as far as we can tell, a more generous measure of damages than any court has ever allowed.

[¶ 28] Such a novel rule could yield particularly disproportionate results in the circumstances of this case. The LeClercs paid Roy only $2400 for the land, but now seek his indemnification for the full amount of damages that Jean LeClerc may have to pay to the Dionnes, which could be over $139,000. We cannot say that the covenant of warranty goes that far.[4] The court did not err in refusing to give the requested jury instruction.

## V. CONCLUSION

[¶ 29] We affirm the judgment adopting the referee's report and declaring that the Dionnes have record title to the disputed property. The judgment in favor of the Dionnes on their timber trespass claim, and in favor of Roy on the LeClercs' third-party complaint, must be vacated. On remand, Jean LeClerc is entitled to a jury trial on timber trespass damages, i.e., on the amount of the statutory forfeiture pursuant to 17 M.R.S. § 2510(2). The Dionnes will recover double the amount, if any, found by the jury, plus professional fees pursuant to 14 M.R.S. § 7552(5).

[¶ 30] As damages for Roy's breach of the covenant of warranty, the LeClercs may recover their reasonable expenses, including attorney fees but not including any timber trespass damages, incurred in defending against the Dionnes' claims, to the extent that those claims concern the property conveyed by Roy's warranty deed. On remand, the court may use any reasonable method to determine what portion of the LeClercs' expenses are assignable to the warranty parcel versus the quitclaim parcel.

The entry is:

Judgment adopting the referee's report affirmed. Judgment in favor of the Dionnes on their timber trespass claim vacated. Judgment on the LeClercs' third-party complaint vacated. Remanded for further proceedings consistent with this opinion.

---

4. To force Roy to pay the damages for Jean LeClerc's timber trespass would also seem to be at odds with the purpose of 14 M.R.S. § 7552. As we recently noted, section 7552's liability is normally imposed on the person who actually cuts the trees, and only extends to a party who hires an independent contractor when, for various reasons, the party may fairly be held responsible for the trespass. *Stockly v. Doil*, 2005 ME 47, ¶¶ 11–15, 870 A.2d 1208, 1211–13. Thus LeClerc, who does not dispute that he is responsible for his independent contractor's trespass, may be required to pay the Dionnes statutory damages and fees of over $139,000, when the timber that was removed was worth less than $8000. That disparity suggests a strong legislative purpose to deter people from cutting trees on others' land. To hold that the covenant of warranty allows LeClerc to shift his liability to Roy might tend to undermine that purpose.